terminal 6.1 was declared open for business the typical opening hours at Teufel's workshop The shuffling All right, I think we've calmed down enough our second case for this morning is Teufel against Northern Trust Company, Mr. DeGrand Thank you, Your Honor. Luke DeGrand for Plaintiff Jim Teufel. May it please the court. On April 1st, 2012, Jim Teufel lost a large measure, we estimate more than 25% of the pension he had accrued over 14 years of service to Northern Trust. Well if he had quit that day or the next day, would he have lost anything? He would not have lost anything as of that day, Your Honor. But ERISA, the Heinz case makes clear, protects more than just the monetary benefit as of the date of the amendment. It protects the value of the benefit. I think it depends in how general terms you want to talk about this. Of course, if you're alluding to the fact that there's an anti-cutback rule, there certainly is an anti-cutback rule. On the other hand, there's a line in ERISA between benefits that have accrued and future expectations of benefits. And there's nothing, to my knowledge, that prohibits a company that runs a plan to change future expectations. So aren't we really, we're just trying to decide whether what happened was a cutback of something, forbidden, or whether it was simply the end of a future expectation. And the plan makes clear that this aspect of average compensation affects the benefit earned by service rendered prior to the date of the amendment. That is clear in Section 2.1 Triple E of the plan, which says, for example, in the 2002 plan, those participants who made the switch from the traditional formula to the original PEP benefit formula as of December 31st, 2002, the 2002 plan makes two things very clear. First, even though the credited service under the traditional formula has ceased, the benefit continues to grow at the rate of future increases in average compensation. That is abundantly clear from the 2002 plan. It's also clear from the 2003 and the 2008 SBDs. And that's fine. There's nothing that says a company can't do that. I mean, it's a nice plan. It's a generous provision. But our question is, can they change that for the future? And the second thing that the plan makes clear, the 2002 plan makes clear, it confirms the definitions by noting that that growth, that continued growth at the rate of average compensation, is attributable to service provided before the date of the amendment. It's a matter of promise, Judge. When the plan makes a promise of accrued benefits based on a formula and the participant provides service in exchange for the benefit defined by that formula, the plan cannot change the formula to the detriment of the participant with respect to the benefits already earned. And that's exactly what happened here. Well, I mean, I do understand that under the new formula, the post-2012 formula, instead of whatever his, if his salary increases had been more than 1.5 percent going forward, he would be getting less fed back into the computation. I guess it's average, there are all these different words, average compensation, eligible compensation, annual compensation. We're not talking about annual, we're talking about, I suppose, average. We are talking about average. Right. And so had he received only raises of 1.5 percent per year post-2012, he'd be in exactly the same position that the bank says he's in now. If he had not received any raises at all, he would be worse off, and if he'd received what had been more like the typical raise he was getting, 3 to 4 to, you know, something like that percent, he's not getting as much fed into the formula for the earlier service. Right. And the fact... But it's very, when I phrase it that way, it seems it's very speculative. It's an expectation of a future increase. It's not something that has already happened. It has not already happened, but the potential for growth commensurate with increases in average compensation is part of the value of the benefit on the date of the amendment. But they're giving him that up to the date of the amendment. Basically, he's now, from their point of view, if they were to prevail, he has a two-part benefit. Part one, from the time that he was hired until the 2012 amendment, which takes advantage of all the formulas that you're talking about, and part two, going forward, which is not as favorable in your view. And we agree that going forward, with respect to his future service, the plan sponsor can change the formula with respect to the future service, but the plan makes clear that they have changed the formula with respect to the service he already provided, and that diminishes the value of the benefit on the date of the amendment. In the amended complaint, in the second amended complaint in this case, we've alleged that Mr. Teufel has historically received more than 5.1% in annual compensation increases. And just in the five years ending March 31, 2016, his average annual compensation increases were 3.64%. Northern has told the federal government in its Form 5500 filings that participants under 65 will receive average annual increases of 3 to 9%. For all of those people, this reduction in the growth of the benefit that they have already earned is a cutback. This court has made clear in Hickey, in Ruppert, and in a whole line of cases, that the fact that growth happens in the future does not preclude it from being considered part of an already accrued benefit, and that's exactly what this plan provides. It doesn't matter whether the formula is a living pension, as in Shaw, or a COLA adjustment, as in Hickey, or the plan earnings, as in Ruppert. Once the plan makes the promise that you will receive growth in connection with the benefit you've already earned, the anti-cutback rule steps in and protects that benefit. Although nothing's really been cut back. It's just been frozen. Well, for Mr. Teufel and others like him, it has been cut back, Judge. Well, he thought it was going to be more. I mean, if they had never changed the plan, it would have been more. Suppose they had just canceled the plan. They said, we're tired of having an ERISA plan. We'll just deal with the market as is. They could have done that, too, right? They could have terminated the plan, yes. And they could have given him raises of anything, and he just wouldn't have had a plan after 2012. Correct. And that raises a whole host of economic incentives and disincentives. It also raises 12.2 of the plan, which specifically says that if they terminate the plan, both credited service and average compensation will be determined at the date of the termination. Right. There's no similar provision with respect to a plan amendment. And that growth is what he's entitled to here, and that's what we're claiming with the accrued benefit claim. Judge, I also want to talk briefly about the 204H claim. So you might talk a little bit about, I think it's the 11th Circuit's Chinodo or Sinodo case. Sure. That seems contrary to where you're going. Sure. In Sinodo, though, the plan specifically said, with respect to the definition of accrued benefits, that it will not take into account any future earnings or any future service. And it was very specific and very explicit. That language has no counterpart in this plan. And the Savani case in the Fourth Circuit distinguished the Sinodo case on that precise basis. When the plan makes a promise, even though it occurs in the future and it relates to the service already provided by the sponsor, a contract is formed and it cannot be violated under ERISA. It's a matter of a promise made has to be a promise kept under Section 204G. You also have argued that the notice he received of this change was inadequate. I wonder if you could say a word about why that's the case. Right. The district court rule. I mean, it's a clumsy chart, I will grant you. Where they didn't give, I don't know who, even my computer skills actually may be better than that. But it's readable. I mean, you can, if you're patient. Our position is, with respect to the chart, that it is not designed to be understood by the average participant, which is what Section 204H requires. If that were the only problem with the notice, we might not be making this complaint. I think it is a significant problem with the notice, but there are other problems with the notice. For example, the notice told participants that the 2012 amendment would not have an impact on their benefits under the traditional formula as of March 31, 2012. That was false. The notice specifically told participants that the 2012 amendment would have a worse impact for younger employees. That was demonstrably false. The charts, in addition to being printed in the way Your Honor noted, used the wrong data for comparison. And as we've pointed out, the rest of the notice is kind of a confused mess. This notice was not. So it's talking about, I mean, I gather there are questions about the Social Security adjustment and the like. It's talking about eligible compensation. What's eligible compensation? It's annual compensation as it's defined by the summary plan descriptions that were distributed to plan participants, and it's annual compensation if you look at the actual data that's used in the charts. And we submitted affidavits to that effect. But there are other places where eligible seems to be something different from annual. That's right. At the end of the notice, they do make an equivalency between average compensation and eligible compensation. The problem with that, in addition to the fact that it's buried at the back of the notice, is that the data in their charts don't reflect that difference or that equivalency. The data in the charts is based upon eligible compensation and specifically not average compensation. But they had this, they also say, to obtain an estimate of your pension plan benefit, go to this place, essentially click on something, access your benefits, and just roll through it. And is it your position that that would have given an inaccurate number or that that was flawed too? We don't know, Judge, because this is a 12B6 dismissal. That is not in the record. But you are attacking the notice. And one of the things the notice is telling people is here's how you can get your numbers specifically. That's right. That's why I'm asking why is that misleading or inappropriate? The reference to the online data tool is not something we're claiming is inaccurate. I don't know what the online data tool said. But we have not had discovery on that issue. What is inaccurate is the statement that younger people will be worse off, there is no mention of the freeze and final offset compensation, and the data that they submit to the participants is the wrong data. Your Honor, I see I'm in my rebuttal time, but I would like to just mention the age discrimination claim, which is largely not challenged by the defendants in their brief. But they do. They say that you're equating age with numbers of years of service, and the cases under the ADEA have said that if you're really looking at people who've served for X number of years, that's not the same thing as age. That's right, and that's in a disparate treatment case. A disparate impact case, if you look at Smith v. City of Jackson and the Meacham case by the Supreme Court, hold that a non-age-related factor is the very premise of a disparate impact age discrimination claim. Here, although they make that argument, they do not contest that there was a disparity in age between the traditional participants and the PEP participants, and it was statistically significant. And they do not contest or challenge the fact that this plan amendment had targeted differences in the reduction in benefits and total compensation that were targeted toward the older traditional participants and benefited the younger PEP participants. Okay. I'll save the rest of my time. That would be fine. Thank you. Ms. Emert? Good morning, Your Honors, and may it please the Court. I'm Amanda Emert. The name has undergone a little bit of Midwesternization since it came into the country, Your Honor, for the defendants' appellees. The only real question before the Court this morning is the one raised in Your Honor's very first question to Mr. DeGrand. That is, had Mr. Teufel quit on the day the amendment became effective, would his accrued benefit under the plan be reduced? It would not have. Why is that the question? His point, I think, is that from the formula, if he worked three more years and had gotten 3% per year increase, then the number that fed into the formula for his benefits up until 2012 would have been higher than it is under your amendment. It is undisputed that had Mr. Teufel worked additional years and the amendment not been put into place, he would have earned a higher benefit than he will receive now. And he says, ergo cutback. That is not what the anti-cutback rule precludes, and it is also not what the plan provides. Mr. DeGrand made the point that had this plan been terminated, there is a provision of the plan, Section 12.2, which provides that the participants' accrued benefits will be determined as of the date of termination. He then went on to say that there is no similar provision for a plan amendment, and that's simply not the case. Section 13.1 of the 2002 plan specifically provides that the plan may be amended so long as it does not reduce the accrued benefit the participants have earned as of the date of the amendment. So the court doesn't need to get into this existential question of whether it's possible for a plan to create an accrued benefit that allows for future earnings, because this plan doesn't do that. If this court were to take up that question, though, it's clear from the Supreme Court's ruling in Hines and from this court's ruling in Hickey and in the Hines case as well, that the moment to consider whether an accrued benefit has been reduced is at the time of the plan amendment, not at some future point. But for the case about future employment, that would have been impossible to have made that decision at the moment a plan was changed. They were already retired, and they were suddenly told you can't work in these other jobs. That's correct. So in Hines there was no question about what the accrued benefit consisted of because the plan participants had already retired. Here, if the participants in Hines had been saying we have a right to go back to work and earn more credit, you would have gotten a different outcome. What they were saying is you told us this is the benefit that we had earned. You can't make it less valuable by imposing additional conditions on it. So you're drawing a distinction between additional conditions and fiddling around with the formula that's used to compute monthly benefits? I am not, Your Honor. Because it seems to me that doesn't really work. I agree that does not really work. The distinction is between whether the benefit that's being reduced is something that has already been earned by past service or something that will be earned in the future. And his argument is it was already earned because you gave me this formula, and, yes, the formula had as one element a number that was going to depend on future events. As I said earlier, it could have been a lower number, it could have been the 1.5, it could have been a higher number. I'm sure that would have depended on the economy and a number of other things that, you know, just the world happens. So why isn't it the formula itself, though, that takes those numbers, what he has the right to, those future numbers, just like future jobs? It's simply more than the anti-cutback rule protects. The anti-cutback rule in the case of a normal retirement benefit. And Mr. Teufel does rely in his briefs on some cases that look at early retirement benefits, which are subject to a different rule and an option to go into them, and early retirement subsidies. That's not what's at issue here. The cases and the statute are quite clear that what's protected is the accrued benefit at the time that the amendment is made. A future expectation that you'll be able to earn more is not protected by the anti-cutback rule. So is the simple difference between Hines in your case, then, that Hines was taking X and subtracting from it, and he wants to take X and add to it? I mean, X being the benefit. And Hines, you're taking away something by saying, oh, and here's this extra list of jobs you can't do, whereas in his case he wants more based on the future. He wants the right to earn more based on the future, and I think that's the difference. So in some of the other cases, for example, where there's a cost-of-living adjustment that's a component of the benefit, there can be a future increase after the date of the amendment that's part of the benefit. Is that spelled out typically in these plans, a COLA, for instance? Yes, a COLA would be spelled out, or in some of the other cases, in the Sinoto case that Your Honor referenced, the particular rules about how a benefit will be calculated once a participant hits a particular age would be spelled out. Here, the language of the plan, and this is a little bit of a tricky thing for a plan drafter. A plan drafter has to draft a formula that can be applied at different points in time. This concept of an accrued benefit gets used for a lot of different things in ERISA, including, as Mr. DeGraham pointed out, filing 5500s and calculating how to fund a plan. But what this plan provision does is provides that at any time a participant's accrued benefit will be calculated by a particular formula, which is based on credited service that has been completed at that point in time. To the extent there's any doubt about what that means in the context of an accrued benefit, Section 13.1 of the plan, which addresses permissible and impermissible changes to benefit accruals, clarifies that. The other thing I want to turn to is this notice, which is really pretty awful. It's quite murky, for one thing, and then one of the things that Mr. DeGraham is focused on, I think I'm looking at the right place under the section, how these changes impact you. There's the paragraph, for those closest to retirement, presumably the older people, the impact of these changes is projected to be less significant than those further from retirement, since most of the final benefit has already been earned, i.e. accrued. And then it talks about this online resource, and he says that's just flat-out wrong, that it's actually a much harsher impact on the people who are closer to retirement because they're losing the benefit to get a higher base, essentially, for their benefits. So we disagree with his statement that that is flat-out wrong. And in fact, what this statement means that Your Honor is referring to is that those who are closest to retirement will have the smallest portion of their benefits calculated under the newly amended provision. Those who are furthest from retirement are going to have more of their benefits calculated under the new formulas, which are less generous overall than the traditional formula benefit. Mr. Teufel himself actually illustrated this point when he elected in 2002 to stay under the traditional formula rather than switching to the PEP formula benefit. Right, and then we have these tables with that last column in unreadable. I mean, it seems odd that you couldn't have done better with this notice because the point of the notice, it really doesn't even matter if Mr. Teufel is particularly sophisticated. It's got to be the average participant who's able to follow all this. So this court might feel slightly more sympathetic toward the drafters of the 204-H notice had you all had the experience we had in our briefing of trying to simply explain the effect of this fairly complex pension amendment. It is a difficult task. Not all that complex. You've just changed the base that's going to be used for people in the traditional plan by capping it at whatever it was in 2012, plus the 1.5%. And then actually there's an additional component, which is that going forward, Mr. Teufel and the other traditional formula participants are accruing benefits under a new PEP formula, which also has to be explained. That's why I said it's an A plus B situation. He's got one type of plan up to the 2012, and then so whatever check he gets once he retires is going to be a two-part check, more or less. That's correct, Your Honor. And the obligation to explain all of the impacts across the entire population of participants that falls on the plan administrator here is a relatively complex task. The plan administrator here, as the 204-H notice demonstrates, tried to explain that in a few different ways. First in narrative text. This is how it works. Then by laying out tables with examples. We are here on a motion to dismiss, so we're confined to the record before the district court. The court can tell by looking at this notice. It says in a few places, click here to go to a certain link. This paper format is probably not the original format that it was created in. No, it looks like it was an email or something. It probably had links. The attempt was both to provide examples of some common scenarios for participants, but then to the extent that the participant had a question about the actual impact of this amendment on that participant, the plan administrator provided an online tool and pretty explicit instructions about how to use it that would allow each participant to calculate their benefit under the amendment and after the amendment in different scenarios. That certainly represents a good-faith attempt on the part of the plan administrator to convey in a manner that's understandable to the average participant what they really care about, which is the impact on them. The notice has to cover the entire population and has to give a lot of different scenarios. Mr. Teufel does not allege in his complaint, nor has there been any suggestion anywhere in the record, that there was anything inaccurate about the estimates that were generated by that tool. Yeah, that's interesting. So it's not even an allegation. No, it's not alleged in the complaint. His primary allegation in the complaint about the notice, Your Honor, and it is why the district court, I believe, dealt with the notice claim the way that it did, was that the notice said that your accrued benefit as of the date of the amendment wasn't changed, and it was. And the court found that that allegation fell once the district court had decided there was no prohibited cutback. So maybe the last thing you can explain for me is the different ways in which this term eligible compensation seems to be used, even within the notice and across the board in the case as a whole. It's not really just annual, is it? So what's relevant to calculating the accrued benefit is the average compensation, which is actually an average of the participant's... Overall, the years of service using... The five highest consecutive years, yes. And that's what's used to calculate the benefit. Eligible compensation is used in the notice in an attempt, I believe, to use simpler terminology that makes more sense to the average plan participant. Why is eligible, which sounds like somebody has an idea of what counts and what doesn't, more clear than annual, which everybody's going to know? Well, if it said annual compensation, which is the defined term, that would leave an open question as to whether it's your last year of compensation or what it actually is, which is... But why is it so hard to say your five best years? Don't people understand that? People may or may not understand your five best years. The task for someone trying to draft a 204-H notice is to attempt to reduce this to its simplest terms, and that is always a challenge and, frankly, always leaves an opening for someone else to come along later and say, you could have explained it in a different way. The obligation is to draft a notice that's reasonably calculated to give an appropriate understanding of the effect of the amendment. Okay. I would also just like to touch very briefly on the ADEA claim that was raised by Mr. Teufel. Under the ADEA, it is clear that if a similarly situated younger participant to Mr. Teufel would receive the same benefit for the same years of service and the same choices, then there is no violation of the ADEA. Now, he's stressing disparate impact, of course, on older people, not just disparate treatment. That is correct. He is stressing disparate impact, and I don't think this court needs to reach the question of whether there's any disparate impact claim that could be brought under the ADEA, because the ADEA is actually quite specific about what claims can and cannot be made under the ADEA when it comes to a pension claim. And it quite specifically states at Section 623.110a.1 that a plan does not violate the ADEA as long as a participant's accrued benefit as determined as of any date under the terms of the plan would be equal to or greater than that of a similarly situated younger individual who is or is not a participant. Is or could be a participant, sorry. The claim here is not that someone who was 10 years younger than Mr. Teufel with the same employment history would get a different benefit. The claim is that there are more people like Mr. Teufel who are older. We didn't dispute that because, again, we're on a motion to dismiss that there are more people who are older, but even if that's true, there's no violation of the ADEA. Thank you, Your Honor. Thank you. Mr. DeGrande, you've got a little bit of time. Thank you, Judge. If I could take the last issue first. With respect to the safe harbor upon which counsel relies, that addresses whether the rate of benefit accrual is discriminatory under the Age Discrimination Act so that it determines whether the rate of benefit accrual under the revised PEP formula is age discriminatory under the Act. That's not our claim. Our claim is that the way this amendment targeted older workers reduced their benefits, and by reducing their benefits, disproportionately affected their total income and their total compensation. Nothing about the safe harbor addresses that kind of a broader claim of disparate impact age discrimination. It wouldn't make sense anyway because they're suggesting that if they can find a hypothetical younger person who is not similarly impacted by the amendment, that washes away the Age Discrimination Act. That's reading way too much into the safe harbor than is justified. With respect to the notice issue, I wanted to point out an additional sentence in the notice that specifically addresses this idea that the 2012 amendment had a more disparate harm for younger participants, and this appears on page 163 of the separate appendix. The plan told participants the differences in lump sum values under the current pension plan formula in terms and the new pension plan formula in terms are greatest for individuals 35 and younger. That's just false. That's a false statement, and it's false regardless of the accrued benefit claim, and it's false regardless of what the online data tool may have said. And the online data tool, even if it's completely accurate in terms of individual consequences of the amendment, cannot displace the statutory obligation and the fiduciary obligation to be straight with the participants in this notice. And the last thing I want to point out is this is a 12B6 motion. We've had no discovery, and on the issue of accrued benefits, the defendant's position is that the only thing that the accrued benefit rule, 204G, ever protects is a specific monetary amount on a specific date. If that were the case, Your Honor, Hickey would make no sense. Ruppert and Berger and all of the cases that apply future growth, which is what this is a proxy for, to past provided service would make no sense. So we ask the Court to reverse and remand the case, and we thank you for your attention. All right, thank you. Thanks as well to Ms. Amert, and we will take the case under advisement. Thank you.